## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION |
| VERSUS | |
| MICHAEL JAMES | NO. 22-00102-BAJ-RLB |

## RULING AND ORDER

Now before the Court are two **Motions to Suppress**, one filed by the Defendant himself, *pro se*, while he awaited appointment of counsel, (Doc. 17), and the other filed once Defense Counsel had been appointed, (Doc. 27). In his Motions, Defendant seeks to suppress (1) evidence gained pursuant to a cell phone ping warrant issued on March 22, 2021; (2) statements made to law enforcement on March 27; and (3) evidence seized during searches of a residence and storage unit, both conducted on March 27. Both Motions are opposed. (Docs. 30, 47). A two-day hearing was held on the Motions on November 17 and 28, 2023. (Docs. 53 and 56). Pursuant to the Court's order at the close of the hearing, the parties submitted additional briefing. (Docs. 59, 60). For the reasons that follow, Defendant's first Motion will be denied, and Defendant's second Motion will be granted in part.

## I.    BACKGROUND

On March 18, 2021, a man named Cedric Clay was arrested by the DEA. (Doc. 57, November 17, 2023 Motion Hearing Transcript, *hereinafter* "Tr. I," at 43). Clay told East Baton Rouge Parish Sheriff's Office (EBRSO) narcotics investigators about

a black man named "Mike," from Houston, Texas, who was making "weekly or bi-weekly trips into the Baton Rouge area supplying [Clay] and another trafficker . . . with a large amount of drugs." (*Id.* at 44–45). Clay also gave Mike's phone number to the deputies. (*Id.* at 46). Four days later, on March 22, Clay told deputies that Mike "was going to be coming in the following weekend to bring drugs" to Baton Rouge. (*Id.* at 45).

Deputies searched the phone number provided by Clay on a DEA database and found "links to past and current narcotics investigations." (*Id.* at 46). A DEA agent in New Orleans saw that the number had been searched, reached out to EBRSO Lieutenant Jordan Webb, and shared that the phone number was connected to a black man named Michael James—the Defendant. (*Id.* at 49). The DEA agent believed that Defendant had been bringing "pressed pills" into the New Orleans area. (*Id.*).

Using this information, EBRSO deputies sought a ping warrant[1] for the phone number associated with Defendant, which would allow deputies to monitor the phone's location. (*Id.* at 51; Doc. 47-1 at 1). The warrant was signed by a judge of the 19th Judicial District Court for the Parish of East Baton Rouge. (Doc. 47-1). At first, the phone pinged from an address in a suburb of Houston. (Tr. I at 56). DEA agents passed by the address, observed a black Porsche parked there, and took down the

---

[1] A "ping" refers to semi-regular and normally automated communications between a cell phone and cell towers. The cell towers, and by extension wireless providers, receive information from these pings that include the cell phone's approximate location. A ping warrant gives law enforcement access to that location information. *See United States v. Mayes*, No. 2:20-CR-00131-01, 2023 WL 3144176, at *1 (W.D. La. Apr. 19, 2023), *report and recommendation adopted*, No. 2:20-CR-00131-01, 2023 WL 3139788 (W.D. La. Apr. 27, 2023). (Doc. 47-1 at 1).

license plate number. (*Id.* at 55). Although the Porsche was not registered to Defendant, deputies learned that Defendant had a business registered to the address. (*Id.* at 55).

On March 26, EBRSO Corporal Joshua Clark received a notification that the Porsche's license plate had been scanned on I-10 eastbound near Lafayette, heading in the direction of Baton Rouge. (*Id.* at 57). The phone also travelled east and was located that night at the Meridian Condominiums, located at 11500 Southfork Avenue in Baton Rouge. (*Id.* at 58).

Early in the morning of March 27, the EBRSO deputies began on-the-ground surveillance at the address. (*Id.* at 58). Around 7:10 a.m., Defendant was observed leaving the apartment complex. (*Id.*). He drove the Porsche to a Life Storage facility, entered, and then left carrying a blue bag. (*Id.* at 61–62). Defendant returned to the Meridian Condominiums address and took the bag inside the building. (*Id.* at 63). At this point—around 7:33 a.m. according to radio transmissions—the EBRSO team began to seek a "rent roll" search warrant for the names of people currently renting units at the Life Storage facility. (*Id.* at 64).

At 8:33, Defendant reemerged, and Lt. Webb decided to have the deputies pull Defendant over for an illegal window tint. (*Id.* at 66). Although Lt. Webb testified that "[t]he vehicle did contain illegal tint" and that "[y]ou couldn't see into [the vehicle]," this reason for the stop was pretextual—the deputies wanted to see if they could use the traffic stop to gather information about Defendant's suspected narcotics trafficking. (*Id.*).

3

Deputy Brandon Dietrich pulled Defendant over into a McDonald's parking lot around 8:42 a.m., Sergeant Eric David joined him, and Lt. Webb waited nearby out of sight, intending to "see how [Defendant] was going to respond, see what they found [sic], before [he and other narcotics investigators] came up and identified [them]selves and went further with the investigation." (*Id.* at 67–68). Deputy Dietrich conducted the stop and concluded that there were no warrants out for Defendant's arrest. (Doc. 58, November 17, 2023 Motion Hearing Transcript, *hereinafter* "Tr. II," at 138–139). Lt. Webb continued to wait on the rent roll warrant. (Tr. I at 70–71). To prolong the stop, by then about 15 minutes long already, the deputies asked Defendant for consent to search the Porsche. (*Id.* at 140). Although during the hearing on Defendant's Motions, Sgt. David testified that he "[does not] remember [Defendant] saying 'yes,'" he testified that "yes, [Defendant] consented." (*Id.* at 140). Lt. Webb testified that it appeared that Defendant gave his consent. (*Id.* at 69–70).

The search of the Porsche took around 12 minutes, and no narcotics or other incriminating material was found. (*Id.* at 140–144). During the stop, the rent roll warrant was signed, and the deputies learned that Defendant rented a storage unit at the Life Storage facility. (*Id.* at 68, 71–72). An officer with a drug-sniffing dog at the traffic stop left to perform a search at Defendant's storage unit, and the search of the Porsche ended. (Tr. II at 21). The other deputies remained at the stop, now 30 minutes long, continuing to "detain" Defendant while they waited for the dog sniff search at the storage facility. (*Id.*).

From this point, the investigation progressed rapidly. The drug dog alerted to

the presence of narcotics at the storage unit. (Tr. I at 72). Shortly thereafter, Lt. Webb approached Defendant and advised him of his *Miranda* rights. (*Id.*). Lt. Webb explained to Defendant that there was an ongoing drug investigation, and that the deputies were in the process of getting search warrants for the storage unit and the Meridian Condominiums. (*Id.* at 73). In response, Defendant told Lt. Webb that "there was approximately one kilogram of heroin in the apartment and . . . approximately two kilograms in the storage unit." (*Id.* at 74).

Meanwhile, other deputies eventually obtained search warrants for the residence and the storage unit. (*Id.* at 76). A search warrant for the residence was signed at 9:29 a.m., (*Id.* at 77), and one for the storage unit was signed at 10:12 a.m., (*Id.* at 85). Large quantities of narcotics were found at both locations. (*Id.* at 80, 87). There are timestamps on the photos taken during the searches, and the timestamps show times before each respective warrant issued. (*See* Doc. 27-1 at 4). In other words, relying only on the times displayed on the photos, the searches appear to have occurred before the warrants were actually authorized by the court. The times of radio transmissions throughout that morning and Lt. Webb's testimony at the evidentiary hearing support a different conclusion—that the searches occurred after the warrants were issued, and the time display on the camera taking the search photos was wrong. (Tr. I at 121).

Following the searches of the residence and storage unit, Defendant was arrested and charged with one count of possessing with intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. § 841(a)(1). (Doc. 1).

## II.    DISCUSSION

Defendant raises three issues in his Motions to Suppress: (1) whether the ping warrant was supported by probable cause; (2) whether the traffic stop was unlawfully prolonged and/or constituted an unlawful arrest; and (3) whether the searches of the storage facility and residence were conducted without a warrant. The Court will address each issue in turn.

### A. The Ping Warrant

The Fourth Amendment provides that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The task of the judge issuing a warrant is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The duty of a reviewing court, like this Court, is simply to ensure that the judge had a "substantial basis for . . . conclud[ing]" that probable cause existed. *Id.* at 238-239. "A court generally will not second guess the [issuing judge's] determination regarding the existence of probable cause in granting a search warrant." *United States v. Trejo*, 492 F. Supp. 2d 659, 674 (W.D. Tex. 2007), *aff'd*, 378 F. App'x 441 (5th Cir. 2010). "Instead, [an issuing] judge's determination on probable cause is given great deference by the reviewing court." *Id.* (internal quotations and citations omitted).

The standard applied by a court when reviewing the sufficiency of an affidavit supporting a search warrant application is whether the "totality of the circumstances" stated in the affidavit demonstrates probable cause to search either the premises or the person. *Gates,* 462 U.S. at 238. A police officer may rely in good faith on the validity of a warrant so long as the warrant is supported by more than a "bare bones" affidavit. *United States v. Cisneros,* 112 F.3d 1272, 1278 (5th Cir. 1997). A bare bones affidavit contains "wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause." *United States v. Laury,* 985 F.2d 1293, 1311 n.23 (5th Cir. 1993). An affidavit is bare bones when the affidavit merely alleges that the police officer "has cause to suspect and does believe" that contraband is located on the premises of the place to be searched. *United States v. Brown,* 941 F.2d 1300, 1301 n.1 (5th Cir. 1991) (*quoting Nathanson v. United States,* 290 U.S. 41 (1933)). "In evaluating the veracity and basis of knowledge of the informant, courts also consider whether police corroborated the informant's statements or conducted an independent investigation." *United States v. Coleman,* 540 F. Supp. 3d 596, 607 (S.D. Miss. 2021) (*citing United States v. Shugart,* 117 F.3d 838, 844 (5th Cir. 1997) (stating the confidential informant's knowledge was strengthened by the DEA's independent investigation which corroborated important aspects of the information provided by the informant); *United States v. Spells*, 215 F. App'x 378, 379–81 (5th Cir. 2007) ("[T]he degree of detail provided by the informant's tip, when considered in conjunction with the corroborating information obtained by Agent Toye, demonstrates that the instant warrant affidavit is not 'barebones.'").

Here, the affidavit submitted in support of the ping warrant contained information from a confidential informant that was then corroborated by additional police investigation. The affidavit reports that the informant told the EBRSO deputies about a black male named Mike who was bringing narcotics from Houston to Baton Rouge and gave the deputies Mike's phone number. (Doc. 47-1 at 3). Although the affidavit does not describe the reliability of the informant, the affidavit adds that independent investigation by the deputies on a DEA database and on the phone with a DEA agent in New Orleans verified the reliability of portions of the informant's story: (1) Mike's phone number was connected to several DEA narcotics investigations in the Houston and New Orleans area; (2) the phone number belonged to someone named Michael James; (3) Michael James is a black man; and (4) Michael James "was the target of a recent case, accusing Michael James distributing [sic] tens of thousands of pressed pills." (*Id.* at 4). Because of this corroboration, under the deferential standard of review this Court must accord the issuing judge's decision, the Court finds that the affidavit is not "so deficient in demonstrating probable cause that it renders [the] officer's belief [in the existence of probable cause] completely unreasonable."[2] *Cisneros,* 112 F.3d at 1278. For these reasons, Defendant's Motion to suppress the ping warrant will be denied.

### B. The Traffic Stop

The protection of the Fourth Amendment "extends to vehicle stops and

---

[2] But it is close. "The affidavit at issue in this case is near the outer boundary of what is acceptable" to survive a fourth amendment challenge. *United States v. Gallegos*, No. CIVASA-04CR0081XR, 2005 WL 1323296, at *9 (W.D. Tex. June 2, 2005).

temporary detainment of a vehicle's occupants." *United States v. Andres*, 703 F.3d 828, 832 (5th Cir. 2013). "[A] traffic stop, even if pretextual, does not violate the Fourth Amendment if the officer making the stop has 'probable cause to believe that a traffic violation has occurred.'" *United States v. Escalante*, 239 F.3d 678, 680–81 (5th Cir. 2001) (quoting *Whren v. United States*, 517 U.S. 806, 810 (1996)). After lawfully stopping a driver for a traffic violation, however, an officer's actions must be "reasonably related in scope to the circumstances that justified the stop of the vehicle in the first place." *Andres*, 703 F.3d at 832. The stop may last no longer than necessary to address the traffic violation, and constitutional authority for the seizure "ends when tasks tied to the traffic infraction are—or reasonably should have been— completed." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015).

Extending a stop beyond what is needed for the initially relevant tasks is proper if "an officer develops reasonable suspicion of another crime" during that time, allowing the officer to "prolong the suspect's detention until he has dispelled that newly-formed suspicion." *United States v. Villafranco-Elizondo*, 897 F.3d 635, 642 (5th Cir. 2018). A reasonable suspicion is one that has "a particularized and objective basis for suspecting the person stopped of criminal activity;" it is "more than an inchoate and unparticularized suspicion or hunch." *United States v. Chavez*, 281 F.3d 479, 485 (5th Cir. 2002).

Here, the constitutional justification for the stop of Defendant ended when the deputies came up empty-handed from their search of the Porsche. The United States readily acknowledges that the reason for Defendant's stop—illegal tint—was

pretextual.[3] (*See* Tr. I at 35). After that violation had been addressed, the deputies used the consensual search as a legitimate means of prolonging Defendant's detention.[4] Once the search ended, however, the deputies no longer had a right to keep Defendant detained. Sgt. David admitted that he learned nothing from the traffic stop and search of the Porsche that justified Defendant's continued detention. (Tr. II at 23). By then, the only reason Defendant remained detained at the scene was because the deputies were "killing time" while deputies brought a drug dog to perform a sniff search at the storage unit. (Tr. I at 144). The events unfolding at the storage facility, however, were driven by factors separate from anything the deputies learned at the traffic stop. In fact, the deputies had already begun the process of applying for the "rent roll" warrant before the traffic stop even occurred. (Tr. I at 63). The deputies conducting the stop developed no "newly-formed suspicion" that needed to be dispelled by the events unfolding at the storage facility. *Villafranco-Elizondo*, 897 F.3d at 642. In other words, the sequential searches at the storage facility—of the rent roll, the dog sniff, and then the unit itself—were rooted in probable cause that

---

[3] The deputies' testimony and their actions show that they had zero interest in the only constitutionally legitimate reason for the stop. No citation was ever issued, (Tr. II at 25), no device to measure tint was deployed at the scene, (*Id.* at 49), and at least one deputy conducting the stop testified that he was unfamiliar with what amount of tint would even be illegal under Louisiana law (*Id.* at 8).

[4] In his latest filing, Defendant floats a challenge to the consensual nature of the search, (Doc. 60 at 9), rooted largely in Sgt. David's inability to remember if Defendant actually said "yes" when asked if he consented to the search, (Tr. I at 139–140). Despite this gap in Sgt. David's testimony, the Court finds that the totality of the circumstances here establish that the stop was consensual. *See United States v. Bass*, 996 F.3d 729, 737 (5th Cir. 2021) (setting forth a six-factor test for whether consent was obtained voluntarily). In particular, Defendant's demeanor as captured on dashcam video was "calm and cooperative," Defendant spent most of the search chatting with deputies, and Defendant aided the deputies in opening the hood of his vehicle. (*See* Tr. I at 138, 142–43).

did not also justify the extension of the stop. Those off-site events did not cure the unconstitutionality of Defendant's prolonged detention in the parking lot, even if they had an important bearing on the deputies' non-pretextual reasons for detaining him. In sum, Defendant's Fourth Amendment rights were violated by his continued detention after the search of the Porsche.

"[T]he exclusionary rule prohibits the introduction at trial of all evidence that is derivative of an illegal search, or evidence known as the 'fruit of the poisonous tree.'" *United States v. Singh,* 261 F.3d 530, 535 (5th Cir. 2001). Verbal statements are subject to the exclusionary rule just as is physical evidence. *Wong Sun v. United States*, 371 U.S. 471, 485–86 (1963). The poisonous tree here is the unconstitutionally prolonged stop. Its fruits are Defendant's statements to Lt. Webb, made after the constitutional justification for Defendant's detention had expired. Because of the fourth amendment violation, the exclusionary rule applies here, and Defendant's Motion to Suppress those statements is granted.

### C. The Searches of the Residence and Storage Unit

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (internal citations omitted). Defendant argues that he was subject to warrantless searches of the Life Storage Unit and the residence at Meridian Condominiums because some evidence suggests that the search warrants were issued after the searches occurred. (Doc. 27-1 at 7). Defendant supports this theory by

11

pointing to the timestamps on the pictures taken during the searches, which display times before the respective warrants authorizing the searches issued. (*Id.*). The United States argues that the camera clocks simply had not been adjusted for the end of daylight savings time, which occurred on March 14, 2021—two weeks before the searches. (Doc. 30 at 6). For this reason, according to the government, the timestamps displayed on the photos is wrong, and the searches occurred after the warrants were issued. Testimony during the evidentiary hearing supported the government's version of events. Lt. Webb credibly testified that the searches were not executed until the warrants were signed. (Tr. I at 121). Time stamps of the deputies' radio transmissions indicate that the deputies waited until the search warrants were signed before proceeding, as constitutionally required. (*See, e.g., id.* at 74, 78–80). Absent testimony or evidence from Defendant controverting these additional facts, the Court must credit the government's testimony.[5]

The credible evidence offered at the hearing supports to Government's argument that the searches of the residence and storage facility occurred after each respective search warrant was issued. *Compare United States v. Turrentine*, No. 4:08CR187 CAS AGF, 2008 WL 2859160, at *5 (E.D. Mo. July 23, 2008), *report and recommendation adopted*, No. 4:08-CR-187 CAS, 2008 WL 3833263 (E.D. Mo. Aug. 14, 2008) (denying motion to suppress where police testimony and photo timestamps supported a *lawful* search time and an uncredible defense witness and the clock on the defendant's computer monitor, captured in photos from the search, supported an

---

[5] EBRSO would be well-advised to ensure that its cameras are regularly updated after each semi-annual time change.

*unlawful* search time) *with Karash v. Machacek*, No. CV 15-28 ERIE, 2017 WL 4269511, at *10 (W.D. Pa. Sept. 26, 2017) (finding fact issue in dispute at summary judgment where officers argued that camera times had not updated with daylight savings time but timestamps displayed times before warrants were issued and witnesses reported seeing officers inside residence before warrants were issued). For these reasons, Defendant's Motion to Suppress the searches of the storage unit and the residence are denied.

III.    **CONCLUSION**

Accordingly,

**IT IS ORDERED** that Defendant's first **Motion to Suppress (Doc. 17)** be and is hereby **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's second **Motion to Suppress (Doc. 27)** be and is hereby **GRANTED IN PART**. The Court will exclude Defendant's statements to Lt. Webb during the traffic stop on March 27, 2021. In all other respects, Defendant's Motion (Doc. 27) is hereby **DENIED**.

**IT IS FURTHER ORDERED** that a telephone status conference be and is hereby **SET** for January 24, 2024, at 11:30 A.M. for purposes of selecting a new trial date. Dial-in instructions will be emailed to counsel prior to the conference.

Baton Rouge, Louisiana, this 19th day of January, 2024.

_____
JUDGE BRIAN A. JACKSON
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

13